**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RYAN BLACK and DAYNIA McDONALD, on behalf of themselves and all other persons similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 16-cv-3958 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| P.F. CHANG'S CHINA BISTRO, INC., | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiffs Ryan Black and Daynia McDonald's motion for step-one notice of their Fair Labor Standards Act collective action [26]. For the reasons set forth below, Plaintiffs' motion for step-one notice [26] is granted in part and denied in part. This case is set for further status on June 13, 2017, at 9:30 a.m.

## I. Background

Plaintiffs Ryan Black and Daynia McDonald worked as servers at P.F. Chang's China Bistro, an "Asian-inspired" casual restaurant operated by Defendant with 218 locations in the United States. [1, ¶¶ 5, 31, 35.] Black worked at a P.F. Chang's restaurant in Lombard, Illinois from August 2012 through June 2014. [27-12, ¶ 1.] McDonald worked at Defendant's restaurant in Westbury, New York from November 2013 through February 14, 2014. [27-13, ¶ 1.] Plaintiffs bring collective action claims on behalf of all similarly situated current and former tipped workers (such as servers, bussers, runners, and bartenders) for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201–19 ("FLSA"), at fourteen separate P.F. Chang's locations—five in Illinois and nine in New York.

Plaintiffs allege that Defendant committed at least four distinct FLSA violations, the first three of which, Plaintiffs argue, precluded Defendant from paying a sub-minimum wage or tip credit rate of pay to its employees. [27, at 10.] First, Plaintiffs allege that Defendant failed to provide employees with statutorily required notice of the FLSA's tip-credit provisions because Defendant provides "incorrect and misleading" information about the amount of the minimum cash wage and maximum tipped credit that a tipped employee must receive according to 29 U.S.C. § 203(m). *Id.* at 5. Second, Plaintiffs allege that they were paid as "tipped" employees for all hours worked (that is, they were paid an hourly rate that is less than the minimum wage, but is subsidized by customer tips), even though they performed "non-tipped" duties such as washing dishes and sweeping floors that are outside the scope of their tipped occupation for more than 20 percent of their shifts. According to Plaintiffs, Defendant was required to pay an employee the full minimum wage for time spent performing non-tipped duties instead of taking a "tip credit" for that time. Third, Plaintiffs allege that tipped employees were improperly required to share their tips with non-tipped employees performing "quality assurance" ("QA") work, such as assisting with plating food in the kitchen and loading finished plates onto trays. [27, at 7.] Fourth, Plaintiffs allege that Defendant required employees to work "off-the-clock" or perform "side work" in violation of the FLSA's overtime and minimum wage provisions. *Id.* at 8.

Plaintiffs have moved for step-one notice for their putative collective action under the FLSA pursuant to 29 U.S.C. § 216(b). [See 26.] In support, Plaintiffs offer two main categories of evidence. On the one hand, Plaintiffs submit evidence of Defendant's nationwide operations and management. This evidence—which touches on wage and hour policy at only a high level of generality—comes predominately from a 2010 lawsuit against Defendant involving claims

under the Americans with Disabilities Act and the Family and Medical Leave Act. See *Meinelt v. P.F. Chang's China Bistro, Inc.*, 787 F. Supp. 2d 643 (S.D. Tex. 2011).

Relying on filings from this other lawsuit, Plaintiffs note that Defendant's "wage and hour policies are detailed in its employee handbook." [27, at 3.] Moreover, Defendant's company charter, which states, "Your Management Team will: Pay employees for all hours worked," is framed and posted in every P.F. Chang's restaurant. [27-3, at 4.] Plaintiffs also contend that Defendant hires employees through a single website, all employees receive the same new employee paperwork,[1] and some work at more than one location during their tenure working for Defendant. [27, at 3.] Defendant's Managers (who oversee a section of a restaurant, like the bar or the front of the house) receive a Manager's Handbook, which has a section on federal wage and hour compliance. [27-2, ¶ 4.] Defendant's Operating Partners (the restaurant's general manager) also attend an eight-week management development program. [27-7, at 3.] And Defendant's Market Partners (managers who oversee Operating Partners at multiple restaurants in a geographic region) are responsible for conducing semi-annual financial audits, which may include review of the restaurants payroll controls, timeclock reports, and "edited punch reports." [27-1, ¶ 4; 27-11.] None of this evidence relates specifically to any of the four FLSA violations that Plaintiffs assert here.

On the other hand, Plaintiffs provide declarations from Plaintiffs Black [27-12] and McDonald [27-13] addressing the particular FLSA violations that they allegedly observed at the Lombard, Illinois and Westbury, New York locations: (1) that they and other employees spent more than 20 percent of their time engaged in non-tipped worked; (2) that they and other employees routinely performed off-the-clock work at the direction of their managers; and (3) that

_____

[1] While Plaintiffs assert that every employee nationwide "receive[s] the same paperwork" [27, at 3], the two new employee checklists they submit undercut that claim. [See 27-2, at 4; 27-4, at 2.] Of relevance, one lists Defendant's Tip Reporting Agreement Form [27-4, at 2], while the other does not [27-2, at 4].

they had a mandatory tip share arrangement with QAs. Plaintiffs also submit excerpts of server training materials indicating that servers engage in non-tipped work like clearing dishes; cleaning tables, candle containers, and cruets; and brewing tea and cleaning teapots. [27-15.]

Plaintiffs also submit three Tip Reporting Agreement forms signed by Black, McDonald, and another employee that Plaintiffs contend are deficient Section 203(m) notices. [See 27-14; 27, at 5.] These documents contain a table listing the state, state abbreviation, "current minimum wage," "current tip wage," and "current cash wage." [27-14, at 3, 5, 7, 8.] According to Plaintiffs, these agreements "incorrectly inverse and mislabel" these categories. [27, at 5.] For example, in Illinois, the minimum cash wage that an employer must pay an employee is $4.95, but this number appears under the column titled "current tip wage" in Defendant's form. The maximum tip credit that an employer can claim in Illinois is $3.30 (*i.e.*, the difference between the state's minimum wage and the minimum cash wage), but this number appears under the column titled "current cash wage." Moreover, the 2015 version of the Tip Reporting Agreement [27-14, at 8] lists $5.65 as the "current tip wage" for New York but the minimum cash wage in New York for food service workers at the time was $5.00. Finally, the 2011 version of the Tip Reporting Agreement omits any notification that "tips received are to be retained by the employee except for a valid tip pooling arrangement." [27, at 11.]

In response, Defendant submits an affidavit from the Operating Partner of the P.F. Chang's restaurant in Buffalo, New York. [31-1, ¶ 2.] That affidavit describes how he reviews the Tip Reporting Agreement in person with employees, explains the differences between tipped wage and the state minimum wage, "make[s] sure employee knows that they will always receive at least state minimum wage for all hours worked," and explains how "P.F. Chang's will increase their compensation to meet the state minimum wage" if their "tips earned are not enough to raise

their hourly pay to minimum wage." *Id.* ¶¶ 5, 7. This affidavit also discusses how the tip pool in his restaurant works, that "each individual will retain all tips they receive, except that servers and bartenders will contribute a small percentage of their daily sales to bussers, runners, and bartenders," and that "other restaurants may run their own tip pool differently." *Id.* ¶¶ 5, 6. Relying on this affidavit and Plaintiffs' evidence, Defendant opposes Plaintiffs' request for step-one notice in its entirety.

## II.    Legal Standard

29 U.S.C. § 216(b) permits a collective action "against any employer * * * by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." *Id.* "A collective action under § 216(b) differs from a class action under Federal Rule of Civil Procedure 23 in that Rule 23 binds class members unless they opt out, whereas collective action members are bound under § 216(b) only if they opt in to the action by providing their written consent." *Franks v. MKM Oil, Inc.*, 2012 WL 3903782, at *9 (N.D. Ill. Sept. 7, 2012) (citation omitted). "The FLSA does not specify the details of how collective actions are to proceed, and thus, the management of these actions has been left to the discretion of the district courts." *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 847 (N.D. Ill. 2008).

"The majority of courts in this circuit have adopted a two-step process for determining whether an FLSA lawsuit should proceed as a collective action." *Soto v. Wings 'R US Romeoville, Inc.*, 2016 WL 4701444, at *5 (N.D. Ill. Sept. 8, 2016) (citation and internal quotation marks omitted); accord *Jirak*, 566 F. Supp. 2d at 847 (collecting cases). "Step one involves a conditional certification, and step two, a final certification. Plaintiffs' burden increases with each, directly proportional to discovery progress." *Briggs v. PNC Fin. Servs. Grp., Inc.*, 2016 WL 1043429, at *1 (N.D. Ill. Mar. 16, 2016); *Blakes v. Ill. Bell Telephone Co.*, 2013 WL 6662831, at *4 (N.D. Ill. Dec. 17, 2013) ("District courts typically follow a two-step

process * * * involving conditional certification of a class pre-discovery followed by a second look at whether collective treatment is appropriate after the parties have engaged in discovery."). As one court in this district explained:

> The certification of an FLSA collective action typically proceeds in two stages. The first stage * * * involves conditionally certifying a class for notice purposes. There is a low standard of proof. The court does not make merits determinations, weigh evidence, determine credibility, or specifically consider opposing evidence presented by a defendant. * * * The second stage * * * comes after any opt-ins have appeared and discovery has been finished. Then the defendant is given an opportunity to move for decertification. At that stage, if requested to do so, the court makes a more rigorous examination of the facts relating to whether or not the case may appropriately continue as a collective action.

*Bergman v. Kindred Healthcare, Inc.*, 949 F. Supp. 2d 852, 855–56 (N.D. Ill. 2013) (internal citations omitted).

This case is at the first stage. "The purpose of conditional certification is to determine the size and contour of the group of employees who may become collective members and whether these potential members are 'similarly situated.'" *Briggs*, 2016 WL 1043429, at *2; *Gomez v. PNC Bank, Nat'l. Assoc.*, 306 F.R.D. 156, 173 (N.D. Ill. 2014) ("The first step focuses on determining whether 'similarly situated' plaintiffs do in fact exist such that a notice can be sent to them" (internal quotation marks and alterations omitted)). The step-one analysis is preliminary in nature and a plaintiff need only make a "minimal showing" that the potential class members are similarly situated. *Creal v. Grp. O, Inc.*, 155 F. Supp. 3d 831, 837 (N.D. Ill. 2016) (citation omitted). Putative collective action members need not be identically situated, only similarly situated. *Briggs*, 2016 WL 1043429, at *2.

Because the parties have not engaged discovery at the time of filing, Plaintiffs need only make a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Id.* (citation omitted); accord *Steger v. Life Time Fitness, Inc.*, 2016 WL 245899, at *2 (N.D. Ill. Jan. 21, 2016); *Strait*

*v. Belcan Eng'g Grp., Inc.*, 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012). "Affidavits, declarations, other documents, or deposition testimony can support this modest factual showing." *Briggs*, 2016 WL 1043429, at *2 (citation and internal quotation marks omitted). However, "[t]he court does not make merits determinations, weigh evidence, determine credibility, or specifically consider opposing evidence presented by a defendant." *Bergman*, 949 F. Supp. 2d at 855–56 (citation omitted); see also *Briggs*, 2016 WL 1043429, at *2; *Larsen v. Clearchoice Mobility, Inc.*, 2011 WL 3047484, at *1 (N.D. Ill. July 25, 2011) ("[T]he court does not resolve factual disputes or decide substantive issues going to the merits."); *Nehmelman v. Penn Nat'l Gaming, Inc.*, 822 F. Supp. 2d 745, 751 (N.D. Ill. 2011) ("[T]he court does not consider the merits of a plaintiff's claims, or witness credibility.").

However, "conditional certification is not automatic." *Briggs*, 2016 WL 1043429, at *2. A plaintiff must "demonstrate[] similarity among the situations of each plaintiff beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the [FLSA] generally must be present." *Id.* (citation and internal quotation marks omitted). If step one's "low burden is met, notice may be issued to prospective plaintiffs who may opt into the action, with discovery to follow." *Creal*, 2016 WL 98566, at *4.

## III.    Analysis

Plaintiffs seek conditional certification of all four of their FLSA claims on behalf of current and former employees at fourteen restaurants in Illinois and New York. The Court takes each FLSA claim separately, and then discusses the appropriate scope of the Section 216(b) notice that Plaintiffs request. But before turning to Plaintiffs' substantive allegations, the Court

addresses Defendant's threshold arguments as to why the Court should deny Plaintiffs' motion in its entirety.

### A.    Plaintiffs' Declarations and Alleged Solicitation

First, Defendant asks the Court to disregard both declarations submitted by the named Plaintiffs because they are electronically signed and the date next to McDonald's electronic signature is blank. "While signatures are required on affidavits, [Defendant] has failed to cite to any legal authority that would suggest an 'electronic signature' is insufficient." *Josleyn v. Hydro Aluminum N. Am.*, Inc., 2009 WL 151160, at *1 (N.D. Ind. Jan. 22, 2009); see also N.D. Ill. L.R. 5.2(a) ("The court will accept for filing documents submitted, signed, or verified by electronic means * * * [.]"); *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 770 (7th Cir. 2008) (questioning whether an electronically signed affidavit was "a defect at all in a world where electronic signatures are regularly honored"). Defendant's sole support for its request to strike comes from cases that struck *unsigned* declarations, not electronically signed declarations. See, e.g., *Fields v. Bancsource, Inc.*, 2015 WL 3654395, at *2 (N.D. Ill. June 10, 2015). In addition, there is a date *under* McDonald's signature. Defendant does not articulate how it has been prejudiced by the manner in which these declarations are signed, both of which made under penalty of perjury. Accordingly, the Court declines to strike these declarations.

Second, Defendant asserts that these declarations, which refer mainly to Plaintiffs' "own personal experiences" and discuss only "unnamed individuals at their own restaurants," are "too vague" to support conditional certification. [33, at 8.] The Court is not persuaded. "Allegations in declarations need not be 'highly specific,' and 'it is not necessary for the declarants to provide such details as the dates and times they worked overtime hours for which they were not compensated." *O'Neal v. Emery Fed. Credit Union*, 2014 WL 842948, at *2 (S.D. Ohio Mar. 4,

2014) (citation omitted). The declarations need "only allege facts sufficient to support an inference that [he or] she has actual knowledge about other employees' job duties, pay structures, hours worked, and whether they were [properly] paid[.]" *Id.* "First-hand observations or conversations with co-workers may be sufficient[.]" *Id.*

In truth, Defendant's description of Plaintiffs' declarations does not match their actual content. Both declarations offer the names of the managers who allegedly assigned the side work, encouraged the off-the-clock work, and instituted the tip-sharing arrangements. Black names QAs who allegedly participated in the tip-sharing arrangements [27-12, ¶ 22], and McDonald names two other servers who were reprimanded for not tipping QAs [27-13, ¶ 25]. Both Plaintiffs also discuss the typical times of the day when they were encouraged to commit these FLSA violations, and that they personally observed other employees commit the same violations. [See, *e.g.*, 27-12, ¶¶ 12–14 ("During opening Saturday shifts I would arrive between 9:00 a.m. to 9:15 a.m., and would be told to not clock in until I received my first table. * * * I know that other tipped employees worked off-the-clock at the beginning of their shifts because I saw other employees arrive early and not punch in."). Defendant offers no reason to think that servers like Plaintiffs would not have been in a position to observe these facts about other employees. While much more will be needed at step-two, these allegations are sufficient to meet Plaintiffs' modest burden at step-one.

Third, Defendant argues that "Plaintiffs' counsel made multiple coordinated attempts to solicit other P.F. Chang's employees to bring claims against the Company," only one decided to opt-in, and "[t]his lack of interest militates against collective certification." [31, at 4.] Specifically, Plaintiffs' counsel sent eleven letters to P.F. Chang's employees in New York and Illinois, "contacting [the employee] as part of [Plaintiffs' counsel's] investigation" into whether

"PF Chang may have violated federal and state wage and hour laws by failing to pay minimum wage and overtime compensation." [31-2, at 4–6.] Defendant does not actually argue that Plaintiffs *violated* Section 216(b) by engaging in this solicitation—only that this conduct should "militate[] against" certification. Indeed, it appears that all of these letters were sent before this case was even filed. The Seventh Circuit has recognized the material difference between sending a solicitation letter before an FLSA suit commences and afterwards. See *Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 580 (7th Cir. 1982) ("Before this suit was filed, [plaintiff] had sent invitations to other members of the class to join with him, and [defendant] does not challenge his right to do this. After suit was filed, however, we do not think it would have been proper for [plaintiff] or his counsel to have sent out such invitations without first communicating to the defendant's counsel his intention to do so[.]"). In any event, Plaintiffs did not use a website with links to proposed notice and opt-in consent forms for the purpose of soliciting potential plaintiffs. See *Chemi v. Champion Mortg.*, 2006 WL 7353427, at *9 (D.N.J. June 21, 2006); *Pfohl v. Farmers Ins. Grp.*, 2004 WL 554834, at *10 (C.D. Cal. Mar. 1, 2004). Their letter is limited to collecting "information" (not opt-in forms) and does not even describe the nature of the alleged minimum wage and overtime violations. The court will not infer that Plaintiffs' claims are meritless or that the scales should be tipped against conditional certification simply because only one person (out of eleven contacted) decided to join the lawsuit in response to this investigatory letter.

### B. Notice Claims

The Court now turns to Plaintiffs' substantive claims. Under the FLSA, an employer may pay a tipped employee less than minimum wage (*i.e.*, the employer may take a "tip credit"), but if the tips, in combination with the below-minimum-wage hourly rate, do not add up to the

minimum wage, the employer has to make up the difference. 29 U.S.C. § 203(m); *Driver v. AppleIllinois, LLC*, 739 F.3d 1073, 1074 (7th Cir. 2014) ("[I]n effect [the tipped employees'] tips are credited against the minimum wage to which they would otherwise be entitled."). Consistent with this framework and pursuant to Section 3(m) of the FLSA, an employer must inform employees (1) of "[t]he amount of the cash wage that is to be paid to the tipped employee by the employer"; (2) of "the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer"; (3) that this additional "amount may not exceed the value of the tips actually received by the employee"; (4) "that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips"; and (5) "that the tip credit shall not apply to any employee who has not been informed of these requirements." 29 C.F.R. § 531.59(b); [27, at 10; 31, at 8–9].

Plaintiffs contend that Defendant fell short of these notice requirements in three ways: (1) all Tip Reporting Agreements "mislabel" the minimum cash wage and maximum tip credit amounts; (2) the 2011 version of the agreement omits the fourth requirement of Section 3(m) (*i.e.*, that all tips received are retained except pursuant to a valid tip pooling arrangement); and (3) that the 2015 version misstates New York's minimum cash wage amount. [27, at 11.] Plaintiffs argue that they "and other tipped employees were subject to a common policy regarding Defendant's failure to give proper notice of taking the Tip-Credit towards their minimum wage," and the existence of a common policy "is clearly established by the fact that Defendant provides uniform Tip Reporting Agreements to its servers and tipped employees." *Id.*

Defendant trains its fire solely on this first alleged deficiency, omitting any discussion of the latter two notice issues. Defendant challenges the type of evidence that Plaintiffs offer to

show the existence of any "common policy," arguing that "neither Named Plaintiff alleges that they (or anyone) were not informed of or did not understand P.F. Chang's use of a tip credit" in their declarations. [31, at 8.] While "[a]ffidavits, declarations, other documents, or deposition testimony *can* support" a plaintiff's modest factual showing, *Briggs*, 2016 WL 1043429, at *2 (emphasis added), Defendant does not explain why Plaintiffs were *required* to submit affidavits detailing their understanding of how Defendant uses tip credits considering that their claim is that the text of Defendant's notice is factually incorrect and does not comply with Section 203(m). Defendant does not dispute that the Tip Reporting Agreement are distributed to all servers and tipped employees. Thus, the common distribution of the same allegedly erroneous Section 203(m) notice is the "identifiable factual nexus that binds the plaintiffs together as victims of a particular violation" of the FLSA. *Molina v. First Line Sols. LLC*, 566 F. Supp. 2d 770, 787 (N.D. Ill. 2007).

Defendant next argues that "there is nothing 'ambiguous' in P.F. Chang's tip credit notice" because the column "current tip wage" clearly refers to the "hourly rate the Tipped Employee receives from P.F. Chang's" and the "current cash wage" is the "tip credit amount, or simply put, the difference between the minimum wage and the hourly wage that P.F. Chang's paid those employees." [31, at 4, 9.] Putting aside the fact that Plaintiffs never characterized the Tip Reporting Agreement as "ambiguous" (they say it was "inaccurate," "incorrect," and "misleading" [27, at 4]), Defendant cannot avoid conditional certification by disputing the merits of Plaintiff's allegations. *Bergman*, 949 F. Supp. 2d at 855–56. Furthermore, nothing from the text of the Tip Reporting Agreement makes it obvious that the phrase "current tip wage" means the minimum cash wage and "current cash wage" means "tip credit amount." As Plaintiffs point out, the same numbers appear in all three columns for California, Nevada, Oregon, and

Washington.  [27-14, at 3.]  If, for example, the current minimum wage in Washington is "9.04"

and the "current tip wage" is "9.04," then presumably the "difference between the minimum

wage and hourly wage" should be zero.  *Id.*  Yet, the Tip Reporting Agreement lists "9.04" under

the column "current cash wage."  *Id.*  An employee relying on this context to understand what

these columns mean in Illinois and New York could be forgiven for not being able to do so.

Defendant further argues that even if the Tip Reporting Agreement is ambiguous, proper

tip credit notice can occur "orally upon commencement of employment."  [31, at 9.]  To that end,

Defendant relies on the declaration from the Buffalo restaurant's Operating Partner, which states

that he verbally explains how the tip credits work to his new employees "in addition to the Tip

Agreement."  [31-1, ¶¶ 4–7; 31, at 10.]  Based on this affidavit, Plaintiff argues that "the only

way to determine whether P.F. Chang's gave proper tip credit notice would be to conduct a store-

by-store inquiry."  [31, at 10.]

This argument is a non-starter.  At the preliminary certification stage, the Court does not

"specifically consider opposing evidence presented by a defendant."  *Bergman*, 949 F. Supp. 2d

at 855–56 (citation omitted).  Even so, Defendant seems argue that because some restaurant

managers may have remedied the alleged notice deficiencies of the Tip Reporting Agreement,

there is no "common" practice of failing to provide notice.  Defendant cites *Adair v. Wisconsin*

*Bell, Inc.*, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008), for the proposition that "[a]lleged

FLSA violations stemming from the enforcement decisions of individual supervisors, rather than

a company-wide policy or plan are not appropriate for collective treatment."  *Id.* at *7.  However,

*Adair* addressed whether collective action would be appropriate when individual supervisors

*committed* the alleged FLSA violation.  It did not concern whether the fact that some individual

supervisors may have *cured* what otherwise would have been a common FLSA violation means

there is no "identifiable factual nexus" that binds the employees together. *Briggs*, 2016 WL 1043429, at *2. Defendant cites no other authority supporting that argument, or why this declaration precludes, at this preliminary stage, the conclusion that an incorrect written notice given to all new employees can establish a "common" illegal practice. See *Soto*, 2016 WL 4701444, at *8 ("[A]lthough Defendants have presented a modest factual showing of their own attempting to establish that they *did not* violate the law, that is insufficient to displace the testimony of the six declarants who say otherwise."). Accordingly, Plaintiffs have made the "minimal showing" necessary for conditional certification on their claim that employees lacked notice of "[t]he amount of the cash wage" and "the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer" through the Tip Reporting Agreement, which was distributed consistently across multiple restaurants in multiple states. 29 C.F.R. § 531.59(b); *Creal*, 155 F. Supp. 3d at 837.

Although Defendant does not respond to Plaintiffs' arguments about the alleged notice violations specific to the 2011 and 2015 versions of the Tip Reporting Agreement, Plaintiffs have not met their burden on these claims. Plaintiffs seek conditional certification for "tipped employees who worked in the last three years" at any of Defendant's restaurants in New York and Illinois. Black began working as a server in August 2012 and McDonald began working in November 2013. [27-12, ¶ 1; 27-13, ¶ 1.] In other words, neither Plaintiff worked for Defendant when the 2011 version of the Tip Reporting Agreement was distributed. There is no dispute that the 2012 and 2013 versions of this document (unlike the 2011 version) states that all tips that employees received are retained "except to the extent tips are contributed to a valid tip pool." [27-14, at 2, 4.] Plaintiffs do not explain how they are "similarly situated" to other employees who started working for Defendants in 2011 and received a version of the Tip Reporting

Agreement that omitted this notice. Nor do Plaintiffs explain how such a claim based on deficiencies with the 2011 notice would be timely in light of the FLSA's statute of limitations. See 29 U.S.C. § 255(a). Plaintiffs have not presented an "identifiable factual nexus that binds" the named Plaintiffs with recipients of the 2011 Tip Reporting Agreement for a FLSA claim based on an omission of this Section 203(m) requirement. *Briggs*, 2016 WL 1043429, at *2.

The same is true of Plaintiffs' claim regarding the wrong New York minimum cash wage amount listed in the 2015 Tip Reporting Agreement. Both Black and McDonald stopped working for Defendant in 2014. [27-12, ¶ 1; 27-13, ¶ 1.] Plaintiffs do not explain how they are "similarly situated" to employees who started work in 2015 and received a different Tip Reporting Agreement (with a different alleged error) than the version distributed in 2013 and 2014. As a result, Plaintiffs have not presented an "identifiable factual nexus that binds" them with employees who received the 2015 notice for Plaintiffs' claim related to the alleged misstatement of New York's minimum cash wage amount.[2] *Briggs*, 2016 WL 1043429, at *2.

### C. Dual Jobs Claims

A "tipped employee" "means any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t); accord *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 876 (8th Cir. 2011) ("[A]n employee is a tipped employee if two things occur: 1) he is engaged in an occupation, and 2) the occupation is one in which he regularly and customarily receives at least $30 in tips per month."). An employee may work in a "dual job," such as "where a maintenance man in a hotel also serves as a waiter." 29 C.F.R. § 531.56(e). In that case, the employee "is a tipped employee only with respect to his employment as a waiter" (assuming he "customarily and regularly" receives at least $30 a month

---

[2] Based on the evidence in the record, there does not appear to be any variation across the annual versions of the Tip Reporting Agreement in how the different columns are labeled, and thus Plaintiffs' first notice claim is common to all employees "similarly situated" to the named Plaintiffs for step-one purposes.

in tips), but not his maintenance work. *Id.* The employee "is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man." *Id.*; see *Driver v. AppleIllinois, LLC*, 890 F. Supp. 2d 1008, 1011 (N.D. Ill. 2012) ("An employer may take a tip credit only for hours worked by [an] employee in an occupation in which [he] qualifies as a tipped employee." (citations and internal quotation marks omitted)). Said differently, "if the tipped employees also perform non-tipped duties (provided those duties are *unrelated* to their tipped duties * * *), they are entitled to the full minimum wage for the time they spend at that work." *Driver*, 739 F.3d at 1075 (emphasis added).

This "dual jobs" scenario "is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses." 29 C.F.R. § 531.56(e). "Such *related* duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips." *Id.* (emphasis added). However, "employers cannot take a tip credit if the employee spends more than 20 percent of his or her workday performing these related, non-tipped tasks:" *Soto*, 2016 WL 4701444, at *3 (summarizing the regulatory and case law landscape on this issue). The dividing line between determining which tasks are related or unrelated to the occupation of a restaurant server continues to develop. *Id.*; *Driver*, 739 F.3d at 1075 (noting in dicta that "washing dishes, preparing food, mopping the floor, or cleaning bathrooms" are unrelated to the tipped duties of restaurant servers); *Driver*, 890 F. Supp. 2d at 1032 (listing tasks of "washing windows; cleaning chandeliers; picking up trash in the parking lot; taking out garbage; restocking bathrooms; and dumping and refilling the 'sani' bucket" as unrelated to plaintiffs' tipped occupations); *Schaefer v. Walker Bros. Enterprises*, 829 F.3d 551, 554–55 (7th Cir. 2016) (concluding that the servers' non-tipped duties (*e.g.*, making coffee, cleaning tables, ensuring that hot cocoa is ready to serve

and strawberries are spread on the waffles, etc.) were sufficiently related to their tipped occupation but declining to decide whether un-tipped tasks (*i.e.*, wiping down burners and woodwork and dusting picture frames) were related to the tipped occupation).

Plaintiffs here make both claims: (1) they were required to perform "improper types" of tasks unrelated to their tipped occupation and which they should have the full minimum wage for the time they spent performing that work (the "unrelated dual jobs claim"); and (2) they spent more than 20 percent of their time performing untipped tasks "related" to their tipped occupation and they should have received the full minimum wage for that time (the "excessive related jobs claim"). [33, at 6.] Plaintiffs contend that they were subject to a "common policy relating to side work." [27, at 13.] They rely mainly on their own declarations, which describe the type of tasks that they were made perform (*e.g.*, washing dishes, sweeping floors, cleaning bathrooms, etc.) and state that their managers required them to perform this work, which was more than 20 percent of their shifts and was "regularly" assigned to other tipped employees. [27-12, ¶¶ 3–10; 27-13, ¶¶ 3–10.] They bolster their declarations by submitting Defendant's server training materials, which refer to some of these same cleaning activities. [See 27-15.]

Defendant responds that "requiring Tipped employees to perform non-tip producing work is not unlawful as long as the work is 'related to the tipped occupation,'" and many of the side work tasks that Plaintiffs contest are "precisely the types of side tasks which the law recognizes may be performed at the tipped rate." [31, at 10–11.][3] Whether or not these tasks are "related" or "unrelated" is a merits issue and cannot be resolved at the conditional certification stage. *Soto*, 2016 WL 4701444, at *8. At least some courts have reasoned that cleaning bathrooms and washing dishes are *not* related to a restaurant server's tipped duties. See *Driver*, 739 F.3d at

---

[3] Defendant seemingly overlooks Plaintiffs' argument that even "related" non-tipped work can require payment at the full minimum wage rate if it exceeds 20 percent of the worker's time.

1075. Accordingly, Plaintiffs have made the "minimal showing" necessary for conditional certification on their unrelated dual jobs claim.

Although Defendant ignores Plaintiffs' excessive related jobs claim, Defendant generally challenges whether Plaintiffs have met their burden to show a common unlawful policy pertaining to this side work to justify providing notice to employees working at all fourteen restaurants in Illinois and New York. The fact that both Plaintiffs "were required by management to perform the same non-tipped side work despite working over 800 miles apart at different states" [33, at 6], and that Defendant's training materials refer to some of these cleaning tasks satisfies the "low standard of proof" that there was a common policy that servers perform these tasks (related or not). *Bergman*, 949 F. Supp. 2d at 855. However, these facts suggest nothing about the amount of time spent on these tasks, let alone the existence of a common policy that employees spend over 20 percent of their work time on these tasks.

Plaintiffs' only evidence that employees perform an "excessive" amount of non-tipped work comes from their own affidavits. [27, at 6.] Those affidavits discuss the times of day, how often, and at whose direction the side work was performed. They both state that the multiple managers in each restaurant "regularly assigned side work to [Plaintiffs] and other tipped employees." [27-12, ¶ 9; 27-13, ¶ 9.] While that evidence could suggest the existence of a common policy in the Lombard, Illinois and Westbury, New York restaurants that employees spend more than 20 percent of their time on related, non-tipped tasks, it does not speak to the practices of any other restaurant. Cf. *Soto*, 2016 WL 4701444, at *8 (submitting six declarations from multiple stores and evidence that "managers of all four franchise stores are trained at the same location, such that managers are capable of transferring between restaurants to fill temporary vacancies or to cover shifts"; "the four franchise stores share employees and kitchen

staff, further establishing the consistency of practices between the stores"; "the training that servers and bartenders receive is the same regardless of the store where they work"; and" at least one server has worked at multiple restaurant locations at the same time."). Thus, Plaintiffs have not met their burden to show the existence of any common "excessive" non-tipped work policy in any other restaurants in Illinois or New York other than the restaurants where they worked. Conditional certification on the excessive related jobs claim must be limited at this time and on the current record to the Lombard and Westbury locations.

### D. Tip Sharing Claim

"Under the FLSA an employer may not avail itself of the tip credit if it requires tipped employees to share their tips with employees who do not 'customarily and regularly receive tips.'" *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 240 (2d Cir. 2011) (quoting 29 U.S.C. § 203(m)). "The FLSA does not define th[e] phrase ['customarily and regularly'] and the Seventh Circuit has not yet interpreted it." *Arango v. Landry's, Inc.*, 2013 WL 3671704, at *4 (N.D. Ill. July 12, 2013).

Courts in other circuits have "generally looked to the job duties of the employees and their level of interactivity with customers in making this determination." *Id.*; *Shahriar*, 659 F.3d at 240 ("[A]n employer loses its entitlement to the tip credit where it requires tipped employees to share tips with (1) employees who do not provide direct customer service or (2) managers."); *Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 231 (5th Cir. 2011) ("Customarily, front-of-the-house staff like servers and bartenders receive tips. Back-of-the-house staff like cooks and dishwashers do not, and thus cannot participate in a mandatory tip pool. Direct customer interaction is relevant because it is one of the factors distinguishing these two categories of workers."); *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 550 (6th Cir. 1999) ("Because the salad

preparers abstained from any direct intercourse with diners, worked entirely outside the view of restaurant patrons, and solely performed duties traditionally classified as food preparation or kitchen support work, they could not be validly categorized as 'tipped employees' under section 203(m)."); *Ford v. Lehigh Valley Rest. Grp., Inc.*, 2014 WL 3385128, at *4 (M.D. Pa. July 9, 2014) ("[E]mployees [must] have more than *de minimis* direct customer interaction in order to be included in a tip pool."); but see *Giuffre v. Marys Lake Lodge, LLC*, 2012 WL 4478806, at *4 n.4 (D. Colo. Sept. 28, 2012) ("The Court notes that interaction with customers is not necessarily the *sine qua non* of the analysis."); *Lentz v. Spanky's Rest. II, Inc.*, 491 F. Supp. 2d 663, 671 (N.D. Tex. 2007) ("Nothing in [Section 203(m)] specifically requires that an employee who shares in a tip pool interact directly with customers."). Other courts, including some in this circuit, have noted that "a critical fact to consider" is whether the tip pooling arrangement is "an ongoing one based on a voluntarily-arrived-at understanding" as opposed to a compulsory arrangement. *Turner v. Millennium Park Joint Venture, LLC*, 767 F. Supp. 2d 951, 954 (N.D. Ill. 2011); see also *Frebes v. Mask Restaurants, LLC*, 2013 WL 5290051, at *3 (N.D. Ill. Sept. 18, 2013) (same); *Arango*, 2013 WL 3671704, at *4 (same); *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 387 (E.D. Mo. 2014) ("Likewise, if the tip pool is deemed voluntary, that also provides a defense to summary judgment.").

Plaintiffs allege that they and other tipped employees "were subject to a common policy requiring them to share a portion of their tips with QAs, a position with no more than *de minimus* customer interaction, and thus ineligible to receive tips." [27, at 14.] The sole support for these allegations is the two declarations from the named Plaintiffs describing the tip pooling arrangements at their restaurants. [27-12, ¶¶ 19–24; 27-13, ¶¶ 22–26.] They describe how QAs had "little personal interaction with customers," and their "duties included standing at the expo

line by the restaurant's kitchen, finishing the plating and presentation of the food, and loading and organizing the plates onto serving trays for delivery by servers or server assistants." [27-12, ¶ 21; 27-13, ¶ 24.] Both Plaintiffs say that "[e]ven if QAs went to the tables, [they] did not see them speak with customers, take customers' orders, or bus their tables." *Id.* Both Plaintiffs were informed of the tip sharing arrangement when they were hired or trained, and both describe this arrangement as non-negotiable. [27-12, ¶ 22; 27-13, ¶ 25.]

Defendant does not respond to this claim. The declaration from the Buffalo Operating Partner discusses how the tip pooling arrangement works at his restaurant [31-1, ¶¶ 5–6], but Defendant does not specifically mention this discussion or why it precludes conditional certification. Thus, Plaintiffs have made the "minimal showing" necessary for conditional certification of this claim for employees at their own restaurants in Lombard and Wesbury. However, nothing about the facts described in Plaintiffs' declarations suggests a mandatory invalid tip pooling arrangement was in place at any other restaurant. Plaintiffs have not met their burden to show that a common illegal policy regarding tip pooling arrangements exists for any of the other restaurants in Illinois and New York. *Briggs*, 2016 WL 1043429, at *2.

## E. Off-The-Clock Claim

"The FLSA requires employers to pay overtime to certain employees who work more than 40 hours in a work week." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011). Plaintiffs contend that they were regularly required to work "off-the-clock" before paying customers arrived at the restaurant, when shifts were slow, at the end of the work day, and when attending mandatory weekend staff meetings. [27-12, ¶¶ 11–18; 27-13, ¶¶ 11–21.] Both Plaintiffs state that they "saw other employees arrive early and not punch in" and that "they too were required to punch out while finishing closing side work." [27-12, ¶ 11–14; 27-13, ¶ 15.]

Defendant does not respond to this argument either. Based on the evidence that Plaintiffs present, they have made the "minimal showing" necessary for conditional certification of this claim for employees at their own restaurants in Lombard and Westbury. But, as with their tip sharing claim, nothing about the practices that Plaintiffs observed at their restaurants suggests the existence of a policy of requiring off-the-clock work at any other restaurant in Illinois or New York. Thus, Plaintiffs have not met their burden that there is a common illegal off-the-clock work policy that applies to any other restaurant in Illinois and New York.

**F.      Defendant's Centralized Control and "Nationwide" Policies**

With the exception of Defendant's Tip Sharing Agreement and the server training materials, Plaintiffs have no specific evidence that any of the alleged unlawful policies were in effect in any restaurant other than the location where they worked. Likely for that reason, Plaintiffs submitted evidence of what they claim is "Defendant's centralized control over its restaurants," which is offered to show that Defendant "has company-wide wage & hour policies equally applicable to tipped employees in Illinois and New York." [27, at 9.] Defendant responds that Plaintiffs rely only on its "lawful" policies—management training, discussion of wage and hour policies in employee handbooks, the posting of the company charter, the existence of financial audits—and "[t]hose policies cannot support conditional certification." [31, at 7.] But Plaintiffs cite this evidence not as direct evidence of illegal conduct, but indirect evidence that "employees at particular restaurants were [not] the only ones to experience the challenged conduct." [33, at 2.] The question, therefore, is whether this generalized evidence of centralized control is sufficient to create an inference that all four of these unlawful policies were present in every P.F. Chang's restaurant in Illinois and New York.

The Court concludes that it is not. In this case, Plaintiffs worked at only one restaurant each and seek to extrapolate all of their FLSA allegations to twelve other restaurants merely on the basis that Defendant is a centrally run company. The cases on which Plaintiffs rely are largely the reverse situation. They contain *several* declarations (or target a fraction of a defendant's geographically concentrated locations), and rely to only a limited extent on specific, centralized practices to show the existence of a particular common policy.[4] In most cases, there is a specific link between the centralized control and the invalid policy, such as evidence of corporate trainers stating that performing "side work" is the corporate policy or declarations by managers about the illegal corporate policy. Many include declarations from employees who worked at several locations and observed the same alleged violations at more than one location.

Plaintiffs offer none of this evidence here. They offer a single declaration from a former employee in New York and a single declaration from a former employee in Illinois. Indeed,

---

[4] *Hart v. Crab Addison, Inc.*, 2015 WL 365785, at *1 (W.D.N.Y. Jan. 27, 2015) (declarations from 21 employees who worked at restaurants in Arizona, Florida, Illinois, Indiana, Maryland, Missouri, New Jersey, New York, Ohio, Texas, Utah and Virginia, many of whom stated that "[t]hey were told by their local managers and/or corporate trainers that the requirement that they perform [untipped side work for more than 20 percent of the time] was part of defendant['s] corporate policies"); *Flood v. Carlson Restaurants Inc.*, 2015 WL 260436, at *3 (S.D.N.Y. Jan. 20, 2015) (six declarations and deposition testimony from employees who worked in eight different states, evidence of "Defendants' policy in which employees are permitted to travel and work at different * * * restaurants nationwide," and statements that "[t]he declarants who worked at two locations allege that they were subjected to identical illicit company-wide policies at both restaurants"); *Robbins v. Blazin Wings, Inc.*, 2016 WL 1068201, at *2 (W.D.N.Y. Mar. 18, 2016) (declarations covering eleven different restaurants in six states and evidence that "managers selected the various non-tip-producing tasks to be performed from checklists provided to managers by [defendant]"); *Knox v. Jones Grp.*, 208 F. Supp. 3d 954, at *3–4 (S.D. Ind. 2016) (declarations from "[e]ight former servers and bartenders, who worked at six of Defendants' restaurants in three states," where "one declaration provides copies of checklists containing additional duties allegedly enforced by management, requiring servers and bartenders to perform non-tipped duties" and noting "[i]mportantly, * * * Defendants train all new managers at their Avon restaurant before assigning them to other restaurants" and "with this uniform training, all servers and bartenders at all of Defendants' restaurants are required to perform the same non-tipped work"); *Soto*, 2016 WL 4701444, at *7 (six declarations from employees who worked at two of the four locations for which conditional certification was sought); *Cope v. Let's Eat Out, Inc.*, No. 6:16-CV-03050-SRB, ECF No. 80, at 5 (W.D. Mo. July 12, 2016) ("several declarations" including two from former mangers discussing how all locations "had the same employment policies").

McDonald worked at the Westbury restaurant for only three months. They do not describe any first-hand observations of these allegedly illegal policies at any other restaurant. They do not submit declarations from management specific to these alleged illegal policies. They offer no evidence that all managers in the states are trained by the same people and in the same location and result in the same policies being carried out in every store. The fact that Defendant has a common website for hiring employees or conducts semi-annual financial audits does not suggest that, for example, every restaurant in New York has an unwritten invalid tip sharing policy.

Moreover, the declarations from *Meinelt* offered by Plaintiff suggest that individual Operating Partners are responsible for training workers at and running the day-to-day operations of each individual restaurants. [27-1, ¶ 2 ("The Company's Operating Partners are, in essence general managers for a particular restaurant, and are responsible for managing and overseeing the day-to-day work of all managers and employees in the store."), ¶ 3 ("Because I cannot be in six stores at the same time, I have to rely on my Operating Partners and restaurant managers to run the day-to-day functions of their businesses."); 27-7, at 2 ("The Operating Partner of each restaurant is responsible for the day-to-day operations of that restaurant including the hiring, training and development of personnel, as well as operating results.").] In fact, Plaintiffs bolster this point in their effort to minimize the significance of the Buffalo Operating Partner's declaration. Plaintiffs argue that this "manager declarant has no personal knowledge from which to testify that any other managers before him at his location or at other locations orally explain the Tip Reporting Agreements as he claims to do." [33, at 5.] If this Operating Partner does not know about the wage and hour practices of any other restaurant, then it is difficult to credit Plaintiffs' argument that Defendant's "centralized control" suggests that every Operating Partner at every restaurant in New York and Illinois follows the same illegal practices. *Id.* at 2.

Ultimately, Plaintiffs do not cite a single case in which a court has granted such a broad certification across multiple states on the basis of two declarations. "Plaintiff[s'] protestation that Defendant is centrally organized * * * does not * * * create cohesion regarding the alleged illegalities at issue." *Burkhart-Deal v. Citifinancial, Inc.*, 2010 WL 457127, at *4 (W.D. Pa. Feb. 4, 2010). And "[t]he fact that all of the potential opt-in plaintiffs are employees of the defendants does not suffice." *Rudd v. T.L. Cannon Corp.*, 2011 WL 831446, at *9 (N.D.N.Y. Jan. 4, 2011) (holding that plaintiffs "have not submitted evidence disclosing the existence of a company-wide policy or practice applicable to all of defendants' locations," but granting certification for the four locations where plaintiffs worked). While the bar for conditional certification is low, it is not non-existent. Plaintiffs have presented sufficient evidence to conditionally certify one of their notice claims and one of their dual jobs claims for all of Defendant's restaurants in New York and Illinois, but their remaining claims cannot be conditionally certified beyond the two restaurants where each declarant worked.

## G. Proposed Form of Notice

Plaintiffs submit a proposed notice and consent form that is substantively identical to the notice that this Court approved in *Soto*. [27-18; 27-19.] Defendant raises several objections to that notice form—many of which were also raised in *Soto*. Defendant argues that the form "gives absolutely no notice" that potential plaintiffs "could be required to participate in the litigation" and pay a portion of Defendant's costs if they are not successful. [31, at 14 (quoting *Robbins*, 2016 WL 1068201, at *7).] Defendant overlooks that the current notice includes the same language from *Soto* about the opt-in plaintiffs' potential discovery obligations (*i.e.*, "[I]f you join this lawsuit, there is a possibility that you will have to answer written questions, sit for a deposition, or testify at trial."), and the Court sees no reason to require different language in this

case.  The Court also declined to add similar language about costs in *Soto*, and follows that same path here.  See *Herrera v. Unified Mgmt. Corp.*, 2000 WL 1220973, at *3 (N.D. Ill. Aug. 18, 2000) (reasoning that "inclusion of such a statement would unreasonably chill participation in this action by potential class members").[5]

In addition, Defendant argues that Plaintiffs fail to state "that the opt-in plaintiffs may select counsel of their choice" [31, at 15], but Defendant does not cite any case that has required such a statement.  Furthermore, Defendant argues that the notice's disclaimer stating that the Court has not taken a stance on the case should appear "at the outset" rather than the conclusion of the notice.  *Id.*  "[T]he 'only thing that matters to the Court is that the notice of lawsuit and consent form convey accurately and fairly all the necessary information at this stage.'"  *Sylvester v. Wintrust Fin. Corp.*, 2013 WL 5433593, at *6 (N.D. Ill. Sept. 30, 2013) (citation omitted).  Defendant does not identify anything inaccurate or misleading about Plaintiffs' placement of this disclaimer, and the Court will not nitpick where this disclaimer should appear in the notice.

Defendant also argues that Plaintiffs' proposed methods of delivery (*i.e.*, regular mail and email), and Plaintiffs' request to send a reminder email and regular mail to all potential opt-in plaintiffs halfway through the 60-day notice period are "unnecessary" and might be seen as "harassment" and improper "encouragement" by the Court to join the suit.  *Id.*  But the notice disclaims that the Court has taken a position on the case's merits, and Defendant does not explain why such a disclaimer does not alleviate this concern.  The Court approved a notice in *Soto* with these same methods of delivery and reminders, and Defendant does not offer any actual reason for changing course here.  See also *Knox*, 2016 WL 4943825, at *7.  The Court concludes that Plaintiffs' proposed methods of delivery and reminders are appropriate.

---

[5] However, courts in the Northern District of Illinois have divided on the issue.  See *Creten-Miller v. Westlake Hardware, Inc.*, 2009 WL 2058734, at *4 (D. Kan. July 15, 2009) (collecting cases).

Finally, Defendant would like the notice to have a separate section setting forth Defendant's position, rather than a simple denial of the allegations. [31, at 15.] The Court believes that such a request is reasonable. Accordingly, the parties should meet and confer to discuss amending the notice to include language regarding Defendant's position on Plaintiffs' allegations. If the parties are unable to reach an agreement, they should present their proposed submissions to the Court in a joint filing shortly by June 8, and be prepared to discuss any points of disagreement at the June 13, 2017 status hearing.

### H. Proposed Form of Notice

One issue not fully addressed by the parties is the scope of the notice appropriate in the event that Plaintiffs were found to be "similarly situated" to employees at some restaurants, but not others, depending on the particular claim.[6] Courts can use subclasses in a FLSA collective action. *Alvarez v. City of Chi.*, 605 F.3d 445, 449 (7th Cir. 2010); *Russell v. Illinois Bell Tel. Co.*, 721 F. Supp. 2d 804, 814 (N.D. Ill. 2010) (creating three subclasses for three different types of claims and decertifying unrelated claims). But the creation of subclasses typically occurs at the second stage. *Smallwood v. Ill. Bell Tel. Co.*, 710 F. Supp. 2d 746, 752–53 (N.D. Ill. 2010).

The parties are encouraged to meet and confer on whether there is a way to craft an appropriate notice in light of the Court's conclusion that Plaintiffs are similarly situated to

---

[6] Plaintiffs assert that "the Court need not engage in a claim-by-claim analysis in deciding whether to allow FLSA notice," and cites a single case to support that proposition. [33, at 7 (quoting *Prickett v. DeKalb Cty.*, 349 F.3d 1294 (11th Cir. 2003).] *Prickett*, however, involved whether opt-in plaintiffs had the same status in a collective action case as the named plaintiffs, and held that the opt-in plaintiffs were not required to file new consent forms to join any claims added to the complaint by amendment. *Id.* at 1297. That scenario does not speak to the issue presented here: whether employees in all fourteen restaurants can receive notice if Plaintiffs are similarly situated to those employees for only certain claims. Nevertheless, courts can engage in a claim-by-claim analysis of FLSA claims. See *McCarragher v. Ryland Grp., Inc.*, 2012 WL 4857575, at *4 (S.D. Tex. Oct. 11, 2012). Accepting Plaintiffs' argument would mean that, for example, a plaintiff pursuing ten FLSA claims could send a notice to all employees nationwide regarding all ten claims simply because it satisfies its step-one burden with respect to one claim, even though it fails to do so for the remaining nine claims. The Court is skeptical that is accurate.

servers and other tipped employees who worked at Defendant's five Illinois restaurants and nine New York restaurants in the last three years with respect to Plaintiffs' notice and unrelated dual jobs claims, but similarly situated only to servers and other tipped employees who worked at Defendant's Lombard, Illinois and Westbury, New York restaurants in the last three years for the excessive related jobs, tip sharing arrangement, and off-the-clock claims. If the parties cannot agree on this notice, they should present their proposed submissions to the Court in the same joint filing referenced above and be prepared to discuss their disagreement at the next status hearing.

## IV.     Conclusion

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion for step-one notice [26]. This case is set for further status on June 13, 2017, at 9:30 a.m.

Dated: May 15, 2017

_____
Robert M. Dow, Jr.
United States District Judge